IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| DAVID BRONER, | |
| Plaintiff, | CIVIL ACTION NO.: 5:19-cv-111 |
| v. | |
| JEFF COLEMAN, | |
| Defendant. | |

### REPORT AND RECOMMENDATION

This matter is before the Court on Defendant Coleman's unopposed Motion for Summary Judgment, filed September 20, 2021.  Doc. 18.  The Clerk of Court mailed a Notice to Plaintiff advising him Defendant Coleman filed a Motion for Summary Judgment and that a response must be filed by October 11, 2021.  Doc. 19.  The Court's Notice further advised Plaintiff:

1. If you do not timely respond to this motion . . ., the consequence may be the Court will deem the motion unopposed, and the Court may enter judgment against you;

2. If your opponent's Statement of Material Facts sets forth facts supported by evidence, the Court may assume you admit all such facts unless you oppose those facts with your own Statement of Material Facts which also sets forth facts supported by evidence; and

3. If a summary judgment motion is properly supported, you may not rest on the allegations in you [Complaint] alone.

Id.  This Notice was not returned to the Clerk of Court as undeliverable to Plaintiff.  Further, Plaintiff moved for an extension of time to respond, which the Court granted in part, giving Plaintiff until November 24, 2021, to respond.  Docs. 21, 22.  The Order granting Plaintiff's extension reminded Plaintiff of his obligation to respond to Defendant Coleman's Motion for

Summary Judgment.  Id.  Thus, Plaintiff requested and received an extension of time to respond, but Plaintiff still has not filed a response, and the time to do so has expired.

However, "the district court cannot base the entry of summary judgment on the mere fact that the motion [is] unopposed but, rather, must consider the merits of the motion."  United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101 (11th Cir. 2004) (citation omitted).  Specifically, the court "must still review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact."  Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009) (citation omitted).

The time for Plaintiff to file a response has elapsed, and Defendant Coleman's Motion is now ripe for adjudication.  For the following reasons, I **RECOMMEND** the Court **GRANT** Defendant Coleman's unopposed Motion for Summary Judgment, **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment, and **DENY** Plaintiff *in forma pauperis* status on appeal.

**PROCEDURAL HISTORY**

Plaintiff filed this case, asserting claims under 42 U.S.C. § 1983, relating to events occurring while Plaintiff was incarcerated.  Doc. 1.  After conducting frivolity review, the Court dismissed Plaintiff's claims for monetary damages against Defendants in their official capacities, Plaintiff's deprivation of property claim against Defendants Todman and Taylor, and Plaintiff's Eighth Amendment claim against Defendant Coleman.  However, Plaintiff was permitted to proceed on his procedural due process claim against Defendant Coleman.  Docs. 8, 20.  Defendant Coleman now moves for summary judgment as to Plaintiff's procedural due process claim.  Doc. 18.

**UNDISPUTED MATERIAL FACTS**

During the events forming the basis of Plaintiff's allegations, Plaintiff was incarcerated at Ware State Prison ("WSP"), where Defendant Coleman was the Warden.[1] Doc. 18-2 at 1. Plaintiff arrived at WSP on April 26, 2018, and was initially housed in a general population cell in Dorm F-1. Id. Dorm F-1 is used to house inmates who have a history of disciplinary infractions. Plaintiff has a history of receiving disciplinary reports for possession of contraband such as cellphones and illegal drugs. Id. at 2.

**I.  Plaintiff's 2018 Assignment to Tier II**

On August 31, 2018, Plaintiff was found in possession of an illegal cellphone, a charger, and tobacco in his cell in Dorm F-1. Id. The disciplinary report associated with the August 31, 2018 incident was dismissed because Plaintiff was not served a copy of the disciplinary report in a timely manner. Id. On October 9, 2018, Plaintiff received a package through the mail at WSP, which prison officials intercepted. Id. The package contained contraband, including 6 cellphones, 1 battery, 6 chargers, 30 grams of marijuana, and 37 grams of tobacco.[2] Id. On November 20, 2018, Plaintiff was assigned to the Tier II program at WSP because of the contraband found in his cell on August 31, 2018, and the contraband mailed to him and intercepted on October 9, 2018. Id. at 2–3.

**II.  The Tier II Program**

The Georgia Department of Corrections ("GDC") uses the Tier Segregation Program to provide a managed stratification-oriented, incentive-based pathway for certain inmates to successfully transition from segregation to lower levels of security as they demonstrate

---

1   WSP is a Georgia Department of Corrections' facility. Doc. 18-2 at 1.

2   Plaintiff is currently facing state charges related to his receipt of this contraband. Id. at 2.

3

appropriate behavior and program compliance.  Id. at 3.  The Tier II Program is not punitive in nature.  Id.  The Tier Program's purpose is to protect staff, inmates, and the public from inmates who commit certain actions or who otherwise pose a serious threat to the safety and security of the prison.  Id.  The Tier Segregation Program is divided into three sub-programs—Tier I, Tier II, and Tier III.  Id.  Tier I is the least restrictive program, while Tier II is somewhat restrictive, and Tier III (or the Special Management Unit ("SMU")) is the most restrictive.  Id.

Tier II is governed by Standard Operating Procedure ("SOP") 209.08, which outlines the basis for assignments to the program and the program's conditions.  Id.  Placement in Tier II is the result of a Classification Committee's decision that the Warden approves.  Id.  To be eligible for placement in Tier II, an inmate must meet certain criteria, including being noted as a threat to the safe and secure operation of the facility.  Id. at 3–4.  This may also include, but is not limited to, inmates who have demonstrated security threat group or gang involvement, notoriety of crimes, high level of supervision requirement, and inmates who have either been threatened with bodily harm or threatened others with bodily harm.  Id.  Three or more disciplinary charges within the previous 12 months that involve assaultive or excessive disruptive behavior would also make an inmate eligible for Tier II classification.  Id.  Inmates with assaultive histories are also eligible.  Id.  An inmate does not need to be found guilty of a disciplinary report for that report to be used as a basis for his placement in Tier II.  Id. at 4.  Inmates can appeal the Classification Committee's decision to the Warden and then to the Director of Field Operations.  Id.

Tier II has three phases—Phase 1, Phase 2, and Phase 3.  Id.  Movement between the phases is based on the inmate's behavior, and the inmate has to complete all three phases to be eligible for new housing assignment, including a return to general population.  Id.  The

Classification Committee reviews inmates' assignments to Tier II every 90 days and decides whether to move the inmate through to the next phase of the program, keep him at the same phase, or send him back to a lower phase.  Id.  As inmates progress from Phase 1 through the program, they are rewarded with more and more privileges.  Id.

### III. The Conditions and Privileges of the Tier II Program

Inmates assigned to the Tier II Program have, at a minimum, a number of privileges, which include, but are not limited to, the following: (1) the opportunity for personal hygiene three times per week; (2) food in the same quality and quantity as that provided to inmates in general population; (3) five hours of exercise per week; (4) telephone privileges in accordance with limitations outlined in Phase assignments; and (5) visitation privileges in accordance with limitations outlined in Phase assignments.  Id. at 4–5.  The Tier II SOP outlines the privileges to which inmates in each phase of the program are entitled.  Id. at 5.  For example, inmates are allowed up to $15.00 per week to spend in the prison's commissary in Phases 1 and 2 and $30.00 per week in Phase 3.  Id.  In general population, inmates are allowed up to $60.00 per week.  Id.  Additionally, Plaintiff had regular visits form his counselor, had access to toothpaste and a toothbrush, and had envelopes and stamps to write anyone outside the prison.  Id.  While Plaintiff had visitation privileges, he never utilized them while assigned to Tier II.  Id.

### IV. Process Plaintiff Received While in Tier II

When Plaintiff was assigned to Tier II, he received a Tier II Assignment Recommendation and Memorandum.  The memorandum informed Plaintiff of his assignment to Tier II because of the contraband found in his cell on August 31, 2018, and because of the contraband mailed to him and intercepted on October 9, 2018.  Id. at 5.  Plaintiff appealed his assignment to Tier II, and that appeal was denied.  Id. at 6.  In the response to Plaintiff's appeal,

dated December 3, 2018, Plaintiff was once again informed he was placed in Tier II because of contraband found in his cell on August 31, 2018, and contraband intercepted in the mailroom on October 9, 2018. Id.

On February 26, 2019, Plaintiff received his first 90-day review and was promoted from Phase 1 to Phase 2 of Tier II. Id. Plaintiff received additional privileges based on his new housing assignment. Id. On May 28, 2019, Plaintiff received his next 90-day review and was subsequently promoted to Phase 3. Id. After Plaintiff finished Phased 3 of Tier II, he remained in Tier II's "Step-Down" program for an additional three months. Id. The Step-Down program is for inmates that the prison considers a danger to the safe and secure operation of the prison if those inmates were reassigned to general population. Id. On November 6, 2018, Plaintiff received his final 90-day review and was reassigned to general population. Id. at 7. In total, Plaintiff spent 268 days in the Tier II program. Id.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, there must exist a conflict in substantial evidence to pose a jury question." Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)). "If the evidence [produced by the

nonmoving party] is merely colorable or is not significantly probative summary judgment must be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 at 249 (1986) (citations omitted).

The moving party bears the burden of establishing there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. See Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing the record lacks evidence to support the non-moving party's case or the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex v. Catrett, 477 U.S. 317, 322–23 (1986)). Once the party moving for summary judgment satisfies its initial burden, the burden shifts to the non-moving party to come forward with specific facts showing a genuine dispute for trial. Hinson v. Bias, 927 F.3d 1103, 1115 (11th Cir. 2019). In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the non-moving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011).

**II.     Plaintiff's Procedural Due Process Claim**

Plaintiff's procedural due process claim concerns his placement in Tier II administrative segregation. Doc. 1 at 7. Plaintiff contends his rights were violated because he was placed in Tier II based on "unreviewed incident reports." Id. According to Plaintiff, such a practice allowed the prison to place him in Tier II segregation without proving he is guilty of the alleged disciplinary charges. Id. Plaintiff states he was never "formally charged" with a disciplinary

7

violation, he was never found guilty of any disciplinary offense, and he did not receive an administrative segregation hearing within 96 hours. Id. Plaintiff avers he is entitled to "minimum due process safeguards" before being assigned to Tier II segregation. Id. at 7–8.

Defendant Coleman argues he is entitled to summary judgment because Plaintiff has no liberty interest relating to his assignment to Tier II, Plaintiff was afforded all the process he was due, and Defendant Coleman is entitled to qualified immunity. Doc. 18-1.

A. Legal Standard for Procedural Due Process Claim

Section 1983 claims for denial of procedural due process require three elements: "(1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003). "Determining whether one was deprived of liberty presents a unique challenge with prisoners, who are already deprived of their liberty in the ordinary understanding of the word." Kirby v. Siegelman, 195 F.3d 1285, 1290 (11th Cir. 1999); see also Jacoby v. Baldwin County, 835 F.3d 1338, 1346 (11th Cir. 2016) (citing Bass v. Perrin, 170 F.3d 1312, 1318 (11th Cir. 1999)). In Sandin v. Conner, the United States Supreme Court rejected tests which determined categorical liberty interests through analysis of the language and structure of the state's laws and policies. 515 U.S. 472, 483–85 (1995). Rather, the Supreme Court held that, in evaluating whether a due process liberty interest exists, courts should examine the conditions of confinement, not the language or structure of the state law or the prison's grievance policies. Id.

The Supreme Court has identified two situations in which a prisoner can be further deprived of his liberty such that due process is required. Kirby, 195 F.3d at 1290–91. First, there is a protected due process liberty interest "when a change in the prisoner's conditions of

confinement is so severe that it essentially exceeds the sentence imposed by the court."[3] Id.; Sandin, 515 U.S. at 484.  Second, a state-created liberty interest may arise "when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy, and the deprivation of that benefit 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  Kirby, 195 F.3d at 1291 (quoting Sandin, 515 U.S. at 484); see also Smith v. Deemer, 641 F. App'x 865, 868 (11th Cir. 2016) ("Atypical and significant hardships must also be severe relative to regular prison."); Jacoby, 835 F.3d at 1346–47 ("This test examines the hardship imposed on the inmate relative to the 'basic conditions' of prison life.").

Thus, a state-created liberty interest in avoiding segregated confinement may exist where the conditions of the segregated confinement constitute an "atypical and significant hardship on the inmate" as compared to the general population.  Quintanilla v. Bryson, 730 F. App'x 738, 743 (11th Cir. 2018) (quoting Sandin, 515 U.S. at 484); Turner v. Warden, GDCP, 650 F. App'x 695, 700 (11th Cir. 2016); Wallace v. Hamrick, 229 F. App'x 827, 830 (11th Cir. 2007) (noting the "touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" (quoting Wilkinson v. Austin, 545 U.S. 209, 223 (2005)). "Confinement to administrative segregation, under conditions substantially similar to those experienced by the general population of the prison," however, "does not implicate liberty interests . . . ."  Al-Amin v. Donald, 165 F. App'x 733, 738 (11th Cir. 2006).  Therefore, courts must determine whether the conditions the plaintiff experienced in segregated

---

[3]     Plaintiff does not argue the conditions he experienced in Tier II at WSP "essentially exceeded the sentence imposed by the court."

confinement present such a dramatic unfavorable departure from the basic conditions of an inmate's sentence that the plaintiff has an independent liberty interest in their avoidance. Wilkinson, 545 U.S. at 223–24 (citing Sandin, 515 U.S. at 485).

In assessing the severity of the hardships faced by inmates in segregated confinement, the Court looks first to the seminal Supreme Court case Wilkinson v. Austin, 545 U.S. 209 (2005). In Wilkinson, the Court held prisoners had a liberty interest in avoiding confinement in a "Supermax" prison because the conditions there constituted an atypical and significant hardship. Id. at 224. Specifically, almost all human contact was prohibited, including conversation between cells; a light in the cell was on for 24 hours per day; exercise was only allowed in a small indoor room; confinement was indefinite and was only reviewed annually; and placement in the Supermax facility disqualified otherwise eligible inmates from parole consideration. Id. at 223–24. The Supreme Court explained that, "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." Id. at 224.

The Eleventh Circuit considered a similar issue in Turner v. Warden, GDCP, 650 F. App'x 695 (11th Cir. 2016). In Turner, a prisoner-plaintiff asserted a procedural due process claim concerning his assignment to Georgia State Prison's SMU.[4] The court concluded the SMU conditions were similar to those in the general population, noting the following SMU conditions:

> Plaintiff regularly received meals and five hours of outdoor recreation time each week. He was allowed to shower three times per week. Unless he was in the most restrictive wing, he was allowed to have his personal property and in some wings even had a television in his cell. Plaintiff was not denied human contact and even received visitation on the weekends.

---

[4] Notably, the SMU (known as Tier III) is the most restrictive level of incarceration in the Georgia prison system. Doc. 18-2 at 4.

10

Id. at 700.  The court held there was "no combination of facts demonstrating that [plaintiff's] incarceration in the [SMU] imposed an atypical and significant hardship compared to ordinary prison."  Id. at 701.  As a result, the court held the plaintiff had no state-created liberty interest in avoiding confinement in the SMU and affirmed the trial court's grant of summary judgment to defendant on the claim.  Id.

In another Eleventh Circuit opinion, the court discussed conditions of confinement in another Georgia prison's SMU and assumed, for the sake of argument, the conditions imposed an atypical and significant hardship.  DelGiudice v. Primus, 679 F. App'x 944, 948 (11th Cir. 2017).  There, the plaintiff alleged, in response to a motion to dismiss, the following:

> [H]e had been in SMU for over three years; the SMU cells were 60 square feet; he was limited to recreation two times a week, showers three times a week, a phone call once a month, and cell cleaning once a week; he was prohibited from attending religious or educational programs, and from associating with other prisoners; and he was deprived of an adequate law library and legal books.

Id.  The DelGiudice court assumed, without deciding, the allegations stated an atypical and significant hardship relative to general population, but, ultimately, affirmed the trial court's dismissal of the claim because plaintiff was afforded the minimum requirements of due process in his segregation assignment.[5]  Id.

B.  **Analysis of Procedural Due Process Claim**

The threshold issue to resolving Defendant Coleman's Motion for Summary Judgment is whether Plaintiff held a liberty interest in avoiding assignment to and continued confinement in Tier II at GSP.  If Plaintiff did not possess such a liberty interest, there is no need to assess the

---

[5] It is worth noting the three years of segregation impacted the court's atypical and significant hardship analysis.  DelGiudice, 679 F. App'x at 948.  Indeed, the Eleventh Circuit noted "[b]oth the period of time and the severity of the hardships must be taken into consideration.  Id. at 947 (citing Magluta v. Samples, 375 F.3d 1269, 1282 (11th Cir. 2004)).

11

adequacy of the procedures used to place and maintain Plaintiff on Tier II because no specific process was constitutionally required. See Wilkinson, 545 U.S. at 221. Based on the undisputed facts, Plaintiff cannot show he held a liberty interest in avoiding assignment to Tier II. Plaintiff did not file a response to Defendants' Motion for Summary Judgment, and, thus, Plaintiff has produced no evidence showing he faced an atypical and significant hardship. Quintanilla, 730 F. App'x at 743.

Considering the Eleventh Circuit's previous decisions, the undisputed evidence in this case demonstrates the conditions Plaintiff experienced while in Tier II at GSP were not atypical and significant relative to the general population conditions. Importantly, Plaintiff was housed in Tier II, which is less restrictive than Tier III (SMU). Doc. 18-2 at 2. The Eleventh Circuit has previously held an inmate does not have a liberty interest in avoiding placement or continued confinement even in the more restrictive SMU. Turner, 650 F. App'x at 700; DelGiudice, 679 F. App'x at 948. It is undisputed Plaintiff, as an inmate assigned to the Tier II Program, received the following: personal hygiene opportunities three times per week, including regular showers; similar food to the general population in both quality and quantity; five hours of exercise per week; telephone privileges; and visitation privileges. Doc. 18-2 at 4–5. Depending on phase placement, Tier II inmates were permitted to use a quarter to half of the commissary funds general population prisoners were permitted. Id. at 5. Additionally, Plaintiff had regular visits from his counselor, had access to toothpaste and a toothbrush, and had envelopes and stamps to write anyone outside the prison. Id.

A reasonable jury could not find these conditions, taken together, rise to the level of an atypical and significant hardship compared to the general population. Wilkinson, 545 U.S. at 224. Like the inmate in Turner, Plaintiff was afforded opportunities for human contact, regular

meals and hygiene, and exercise time as a Tier II inmate.  650 F. App'x at 700.  This Court and other courts have also previously held inmates do not possess a liberty interest in their assignment to Tier II.  See, e.g., Lundy v. Bryson, No. 5:16-cv-71, 2020 WL 4810237, at *9 (S.D. Ga. July 28, 2020) (granting summary judgment for defendants relating to Tier II claim at Ware State Prison); Quintanilla v. Bryson, No. 6:17-cv-4, 2020 WL 1441405, at *9 (S.D. Ga. Mar. 20, 2020) (granting summary judgment to defendant where undisputed material facts demonstrated the conditions plaintiff experienced while on Tier II at Georgia's Smith State Prison did not constitute an atypical and significant hardship); Maddox v. Owens, No. 5:15-cv-36, 2018 WL 1513671, at *8 (M.D. Ga. Mar. 27, 2018) ("[T]he Court finds there is no material issue as to whether the conditions Maddox faced in [Tier II at] Macon State Prison, taken together, do not rise to the level of an 'atypical and significant hardship within the correctional context.'").

The conditions Plaintiff experienced, as presented to the Court through the evidence before it, are less severe than the conditions described in Wilkinson and DelGiudice.  Unlike the inmate in Wilkinson, Plaintiff's Tier II assignment was reviewed every 90 days as opposed to yearly.  Doc. 18-2 at 5–6.  As stated above, Plaintiff was not deprived of human contact like the inmate in Wilkinson because Plaintiff had regular visits with his counselor, was permitted visitation and phone calls even though he may not have used these privileges, and could write letters to anyone outside of WSP.  Id. at 5.  Unlike the inmate in DelGiudice, Plaintiff was held in Tier II for less than one year as opposed to three.  Id. at 7.  Again, Plaintiff has not produced any evidence tending to show Tier II inmates are treated atypically different compared to the general population.  For this reason, Defendant Coleman is entitled to summary judgment.  Because I find Plaintiff cannot show a liberty interest, I decline to address whether Plaintiff was

afforded due process and whether Defendant Coleman is entitled to qualified immunity. Accordingly, I **RECOMMEND** the Court **GRANT** Defendant Coleman's Motion for Summary Judgment.

### III.  Leave to Appeal *in Forma Pauperis*

The Court should also deny Plaintiff leave to appeal *in forma pauperis*. Though Plaintiff has not yet filed a notice of appeal, it is proper to address these issues now. See Fed. R. App. P. 24(a)(3) (trial court may certify appeal of party proceeding *in forma pauperis* is not taken in good faith "before or after the notice of appeal is filed").

An appeal cannot be taken *in forma pauperis* if the trial court certifies the appeal is not taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3). Good faith in this context must be judged by an objective standard. Busch v. County of Volusia, 189 F.R.D. 687, 691 (M.D. Fla. 1999). A party does not proceed in good faith when he seeks to advance a frivolous claim or argument. See Coppedge v. United States, 369 U.S. 438, 445 (1962). A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless. Neitzke v. Williams, 490 U.S. 319, 327 (1989); Carroll v. Gross, 984 F.2d 392, 393 (11th Cir. 1993). Thus, a claim is frivolous and not brought in good faith if it is "'without arguable merit either in law or fact.'" Moore v. Bargstedt, 203 F. App'x 321, 323 (11th Cir. 2006) (quoting Bilal v. Driver, 251 F.3d 1346, 1349 (11th Cir. 2001)); see also Brown v. United States, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009).

Based on the above analysis of Plaintiff's claims and Defendant Coleman's Motion for Summary Judgment, there are no non-frivolous issues to raise on appeal, and an appeal on these

claims would not be taken in good faith. Thus, the Court should **DENY** Plaintiff *in forma pauperis* status on appeal.

## CONCLUSION

Because Plaintiff has not presented a genuine issue of material fact, I **RECOMMEND** the Court **GRANT** Defendant Coleman's unopposed Motion for Summary Judgment, **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment, and **DENY** Plaintiff *in forma pauperis* status on appeal.

Any objections to this Report and Recommendation shall be filed within 14 days of today's date. Objections shall be specific and in writing. Any objection that the Magistrate Judge failed to address a contention raised in the Complaint or an argument raised in a filing must be included. Failure to file timely, written objections will bar any later challenge or review of the Magistrate Judge's factual findings and legal conclusions. 28 U.S.C. § 636(b)(1)(C); Harrigan v. Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1192–93 (11th Cir. 2020). To be clear, a party waives all rights to challenge the Magistrate Judge's factual findings and legal conclusions on appeal by failing to file timely, written objections. Harrigan, 977 F.3d at 1192–93; 11th Cir. R. 3-1. A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United

15

States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a District Judge.

**SO REPORTED and RECOMMENDED**, this 7th day of June, 2022.

_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA